ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

ROBERT PIARO,

Defendant.

**SEALED INDICTMENT**

23 Cr. _____ (____)

2 CRIM 420

The Grand Jury charges:

## OVERVIEW

1. From at least in or about February 2017 through at least in or about December 2022, ROBERT PIARO, the defendant, controlled and served as the Treasurer of four political action committees (the "PIARO PACs") based in Wisconsin. The PIARO PACs raised over approximately $28 million from hundreds of thousands of donors nationwide through, among other things, false statements and misrepresentations made to donors about how donor contributions would be spent. The PIARO PACs were each established with names and purported missions that indicated they were intended to advance certain causes, like combatting breast cancer or supporting firefighters, emergency responders, or veterans. In fundraising for the PIARO PACs, PIARO made and authorized others to make fraudulent claims about how the PIARO PACs had spent and would spend donor contributions. At PIARO's direction, misrepresentations were made to donors that the PIARO PACs would, among other things, advance specific legislation, educate lawmakers, and conduct and fund research, when PIARO did not and did not intend to follow through on these representations. PIARO made and authorized false and misleading representations to donors over the course of approximately five years through, among other things, call scripts to be used by

telemarketers to contact potential donors, mail sent to potential donors, and websites for the PIARO PACs.

2. In addition, between at least in or about 2017 up to and including in or about 2018, PIARO agreed with a telemarketer that certain of the PIARO PACs would receive an advance of approximately $30,000, and in exchange, 100 percent of the money subsequently raised by the telemarketer for those PACs for a certain time period would be kept by the telemarketer (the "100% Agreements"). Despite the 100% Agreements, PIARO continued to direct the telemarketer to call potential donors to solicit donations on behalf of the PIARO PACs even though none of the money raised during the time periods of the 100% Agreements funded the PIARO PACs. Based on these false and misleading representations, the PIARO PACs received millions of dollars in contributions from donors across the country, very little of which went to the causes purportedly supported by the PIARO PACs.

## BACKGROUND

3. PACs are entities registered with the Federal Election Commission ("FEC") that may be tax-exempt, and collect money to advocate on behalf of or against certain causes and political candidates. Under federal law, independent expenditure-only PACs are PACs that make only independent expenditures—expenditures for communications that expressly advocate the election or defeat of a clearly identified candidate—and may raise unlimited contributions provided they do not make expenditures in coordination or in concert with any candidate for federal office or such a candidate's committee. PACs are required to file periodic reports with the FEC providing information about their fundraising and expenditures. Based on these reports, the FEC provides information about each PAC to the public through a searchable public database of,

among other things, how much money is raised and spent by each PAC and how that money is spent.

4.      As set forth in more detail below, each of the PIARO PACs was established by ROBERT PIARO, the defendant, between in or about 2016 and 2017. The PIARO PACs principally fundraised through telemarketing solicitations and mail sent to potential donors, and donors and potential donors were also referred to websites for each of the PIARO PACs that described each PAC's purported mission and activities, among other things. PIARO paid himself from the donor contributions made to the PIARO PACs.

## THE BREAST CANCER PAC

5.      ROBERT PIARO, the defendant, registered Americans for the Cure of Breast Cancer (the "Breast Cancer PAC") with the FEC on or about November 9, 2017, and filed a termination report for the PAC in or about April 2020. In mail sent to potential donors and on the Breast Cancer PAC's website, both of which contained language written or approved by PIARO, PIARO made false and misleading representations to donors, including that:

   a.   The Breast Cancer PAC "funds, conducts research, shares expert information, supports patients, and spread[s] the word of prevention" of breast cancer.

   b.   The Breast Cancer PAC "advocate[s] to increase funding for support services for those walking through breast cancer and its treatment" and "push[es] legislators and lawmakers to step up for [breast cancer support] organizations."

   c.   "When you donate to [the Breast Cancer PAC], you help us to bring your voice to the halls of our federal, state, and local policy makers. By uniting our voices, we make a far stronger impact – together!"

    d. "Your donation also allows us to spend significant time and money educating lawmakers about current bills which help fund research and determine policies that affect breast cancer patients."

  6. Between in or about 2018 and January 2020, ROBERT PIARO, the defendant, and the Breast Cancer PAC raised over $2 million from donors. PIARO paid himself approximately $43,000; paid approximately $29,000 to relatives of PIARO whose work for the PAC primarily consisted of forwarding bills to the PAC's accounting firm (the "Relatives"); and paid the majority of the funds raised (over $1.7 million) to several entities controlled by a single individual ("Individual-1") that provided telemarketing and related services for the PACs (the "Individual-1 Entities"). As part of an agreement with Individual-1, PIARO paid commissions of approximately 90 percent or more to the Individual-1 Entities, on which PIARO heavily relied for fundraising. Notwithstanding the representations made to donors about what the Breast Cancer PAC was doing and what donations were used for—such as "funding research," "push[ing] legislators," or "spend[ing] significant time and money educating lawmakers"—it made only a single charitable donation of approximately $10,000 to one breast cancer charity in or about May 18, 2018, did not report spending any money on independent expenditures, and did not otherwise materially fulfill the representations made to donors.

THE EMERGENCY RESPONDERS PAC

  7. ROBERT PIARO, the defendant, registered the Association for Emergency Responders & Firefighters (the "Emergency Responders PAC") with the FEC on or about July 27, 2016, and filed a termination report for the PAC in or about April 2023 (although the termination has not yet been accepted by the FEC). In mail sent to potential donors and on the Emergency

Responders PAC's website (both of which contained language written or approved by PIARO), PIARO made false and misleading representations to donors, including that:

    a.    "Your donation helps us to actively seek out and educate law makers so that together we can honor the service of First Responders."

    b.    The Emergency Responders PAC "will promote public awareness of the needs of emergency responders, advocate for legislation at all levels of government for the general welfare of emergency responders, and ensure that they have access to the most up to date equipment possible."

    c.    The Emergency Responders PAC is "also actively engaged in creating strong legislation to severely punish any person convicted of endangering the life of an Emergency Responder while in the performance of their duties."

8.    Between in or about 2017 and 2022, ROBERT PIARO, the defendant, and the Emergency Responders PAC raised over $7 million from donors. PIARO paid himself approximately $141,657; paid approximately $38,378 to the Relatives; transferred approximately $149,000 to other entities controlled by PIARO for bill and payroll assistance; and paid the majority of the funds raised (over $4.9 million) to the Individual-1 Entities. Notwithstanding the representations made to donors about what the Emergency Responders PAC was doing and what donations were used for—such as "actively seek[ing] out and educat[ing] law makers" and "actively . . . creating strong legislation"—it spent only $10,000 on mailers to support a single candidate for federal office in or about August 2022, made three charitable donations totaling approximately $30,000 in or about 2018 and 2019, and did not otherwise materially fulfill the representations made to donors.

9. Additionally, beginning in or about 2021, in order to appear to be spending more money in support of the PAC's stated aims, the Emergency Responders PAC began endorsing candidates during certain fundraising calls and in mail to potential donors, and then publicly reporting a portion of its fundraising costs as independent expenditures. Through this practice, the Emergency Responders PAC reported over $720,000 paid to the Individual-1 Entities as independent expenditures for such things as tech support, phone lists, and telemarketing payroll expenses.

## THE VETERANS ASSISTANCE PAC

10. ROBERT PIARO, the defendant, registered the US Veterans Assistance Foundation (the "Veterans Assistance PAC") with the FEC on or about August 18, 2017, and filed a termination report for the PAC in or about April 2023. In mail sent to potential donors and on the Veterans Assistance PAC's website, both of which contained language written or approved by PIARO, PIARO made false and misleading representations to donors, including that:

   a. The Veterans Assistance PAC "identif[ies] leaders who will back legislation and public policies that support veterans" and "work[s] to coordinate with local leaders to acquire affordable housing, educational opportunities, vocational training or job retraining. We also work at the local, state and federal level to educate leaders about [post-traumatic stress disorder and suicide prevention]."

   b. The Veterans Assistance PAC "works to find politicians and community leaders at the local, state and federal level to pass legislation, make budget decisions, and create public policies that provide veterans with affordable health care, affordable housing, and further education opportunities."

c.    "Your donation helps us to educate local, state, and federal leaders so that we can create the safety net our returning vets need. By uniting our voices, we make a strong statement about the will of the people of this country to stand behind our veterans."

11.    Between in or about 2017 and 2022, ROBERT PIARO, the defendant, and the Veterans Assistance PAC raised over $15.4 million from donors. PIARO paid himself approximately $295,000; paid approximately $86,000 to the Relatives; transferred approximately $18,000 to other entities controlled by PIARO for bill and payroll assistance; and paid the majority of the funds raised (over $13 million) to the Individual-1 Entities. Notwithstanding the representations made to donors about what the Veterans Assistance PAC was doing and what donations were used for—such as "educat[ing] local, state, and federal leaders"—it spent approximately $260,000 on mailers, billboards, and other advertising supporting three candidates for federal office in 2018, 2020, and 2022; made two donations in 2018 totaling approximately $350,000 to a PAC dedicated to electing members of a particular political party to the House of Representatives; made two donations totaling $30,000 to two PACs controlled by PIARO; and did not otherwise materially fulfill the representations made to donors.

12.    Additionally, beginning in or about 2021, in order to appear to be spending more money in support of the PAC's stated aims, the Veterans Assistance PAC began endorsing candidates during certain fundraising calls and in mail to potential donors, and then publicly reporting a portion of its fundraising costs as independent expenditures. Through this practice, the Veterans Assistance PAC reported over $227,000 paid to the Individual-1 Entities as independent expenditures for such things as tech support, phone lists, and telemarketing payroll expenses.

## THE STANDING BY VETERANS PAC

13. ROBERT PIARO, the defendant, registered Standing by Veterans (the "Standing by Veterans PAC") with the FEC on or about July 27, 2016, and filed a termination report for the PAC in or about July 2022, although FEC records show that the PAC continued to receive donations through at least November 2022. In mail sent to potential donors and on the Standing by Veterans PAC's website, both of which contained language written or approved by PIARO, PIARO made false and misleading representations to donors, including that:

    a. The Standing by Veterans PAC "identif[ies] candidates and current lawmakers at the federal, state, and local level that will support proactive changes for veterans. . . . A major piece of our work is advocating for legislation that will play a part in reducing wait times for VA compensation claims and medical appointments."

    b. Donations "help[] us to reach out to even more lawmakers and advocate not only for improvements at the VA but also in communities around the country."

    c. The Standing by Veterans PAC "advocate[s] for legislation to benefit and support veterans," and is "currently encouraging lawmakers to fund improvements to the Department of Veterans Affairs."

14. Between in or about 2017 and 2022, ROBERT PIARO, the defendant, and the Standing by Veterans PAC raised over $3.4 million from donors. PIARO paid himself approximately $47,000; paid approximately $32,000 to the Relatives; transferred approximately $60,000 to other entities controlled by PIARO for payroll assistance; and paid the majority of the funds raised (over $2.8 million) to the Individual-1 Entities. Notwithstanding the representations PIARO made to donors about what the Standing by Veterans PAC was doing and what donations were used for—such as "advocating for legislation" and "reach[ing] out to . . . lawmakers"—the

PAC made no contributions in furtherance of that mission and made only a handful of charitable donations, including a donation of approximately $20,000 in or about September 2018 to a veterans' charity founded by PIARO, and did not otherwise materially fulfill the representations made to donors.

15. Additionally, beginning in or about 2021, in order to appear to be spending more money in support of the PAC's stated aims, the Standing by Veterans PAC began endorsing candidates during certain fundraising calls and in mail to potential donors, and then publicly reporting a portion of its fundraising costs as independent expenditures. Through this practice, the Standing by Veterans PAC reported over $48,000 paid to the Individual-1 Entities as independent expenditures for such things as tech support, phone lists, and telemarketing payroll expenses.

## STATUTORY ALLEGATIONS

### COUNT ONE
### (Wire Fraud)

The Grand Jury further charges:

16. The allegations set forth in paragraphs One through Fifteen are incorporated by reference as if set forth fully herein.

17. From at least in or about February 2017 through at least in or about December 2022, in the Southern District of New York and elsewhere, ROBERT PIARO, the defendant, in connection with the conduct of telemarketing, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, and attempted to do the same, to wit, PIARO engaged in scheme to defraud donors of the PIARO PACs

through material misrepresentations about how donor contributions would be spent by the PIARO PACs, and sent and received, and caused others to send and receive, wire communications to and from the Southern District of New York and elsewhere, in furtherance of that scheme.

(Title 18, United States Code, Sections 1343, 1349, 2326, and 2.)

## COUNT TWO
### (Mail Fraud)

The Grand Jury further charges:

19. The allegations set forth in paragraphs One through Fifteen are incorporated by reference as if set forth fully herein.

19. From at least in or about February 2017 through at least in or about December 2022, in the Southern District of New York and elsewhere, ROBERT PIARO, the defendant, in connection with the conduct of telemarketing, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money or property by means of false and fraudulent pretenses, representations, and promises, for the purpose of executing such scheme and artifice and attempting so to do, placed and caused to be placed in a post office and authorized depository for mail matter, a matter and thing whatever to be sent and delivered by the Postal Service, and deposited and caused to be deposited a matter and thing whatever to be sent and delivered by a private and commercial interstate carrier, and took and received therefrom, such matter and thing, and knowingly caused to be delivered by mail and such carrier according to the direction thereon, and at the place at which it was directed to be delivered by the person to whom it was addressed, such matter and thing, and attempted to do the same, to wit, PIARO engaged in scheme to defraud donors of the PIARO PACs through material misrepresentations about how donor contributions would be spent by the PIARO PACs, and sent and caused others to send mail

containing such misrepresentations to donors and potential donors in the Southern District of New York and elsewhere in furtherance of that scheme.

(Title 18, United States Code, Sections 1341, 1349, 2326, and 2.)

## FORFEITURE ALLEGATION

20. As a result of committing the offenses alleged in Counts One and Two of this Indictment, ROBERT PIARO, the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Sections 982(a)(8) and 2328, any and all real or personal property used or intended to be used to commit, to facilitate, or to promote the commission of said offenses; and any and all real or personal property constituting, derived from, or traceable to the gross proceeds that the defendant obtained directly or indirectly as a result of said offenses including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses, and any equipment, software, or other technology used or intended to be used to commit or to facilitate the commission of such offenses.

### Substitute Assets Provision

21. If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third person;

    c. has been placed beyond the jurisdiction of the Court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) and Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendant up to the value of the above forfeitable property.

>(Title 18, United States Code, Sections 982 and 2328;
>Title 21, United States Code, Section 853; and
>Title 28, United States Code, Section 2461.)

_____
FOREPERSON

_____
DAMIAN WILLIAMS
United States Attorney